IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | |
| v. | § § | CRIMINAL NO. 4:23-CR-106-ALM-KPJ-2 |
| LELAND JOHNSON (2) | § § § | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Pending before the Court is Defendant Leland Johnson's ("Defendant") Motion to Suppress Evidence and Statements (the "Motion") (Dkt. 41), wherein Defendant seeks the suppression of "all physical, documentary and other evidence seized in connection with the stop and arrest of . . . Defendant and search of his person and vehicle." Dkt. 41 at 1. The Government filed a response (the "Response") (Dkt. 42). Pursuant to 28 U.S.C. § 636(b) and Local Rule CR-59(d), the Motion (Dkt. 41) was referred to the undersigned for a Report and Recommendation. *See* Dkt. 43. For the reasons that follow, the Court recommends the Motion (Dkt. 41) be **DENIED**.

**I.    BACKGROUND**

**A.    Procedural History**

On May 10, 2023, the United States Grand Jury charged Defendant in Count One of the Indictment (Dkt. 1) with a violation of 21 U.S.C. § 846 (Conspiracy to Possess with the Intent to Manufacture and Distribute Methamphetamine). Dkt. 1 at 1. On January 24, 2024, Defendant filed the Motion (Dkt. 41) seeking to suppress evidence seized pursuant to a traffic stop leading to his arrest. *See* Dkt. 41. On February 7, 2024, the Government filed the Response (Dkt. 42) opposing the requested suppression. *See* Dkt. 42. On February 9, 2024, United States District Judge Amos L. Mazzant referred the Motion (Dkt. 41) to the undersigned for a Report and Recommendation.

1

*See* Dkt. 43. On April 4, 2024, the Court held a hearing (the "Hearing") on the Motion (Dkt. 41). Minute Entry dated April 4, 2024. At the Hearing, the Government was represented by Assistant United States Attorney Chris Rapp and Defendant was represented by Federal Public Defender Douglas Schopmeyer. *Id.* During the Hearing, Investigator Jordan Clark ("Investigator Clark") and Deputy Ryan Miller ("Deputy Miller") of the Grayson County Sheriff's Office ("GCSO") testified as Government witnesses. *Id.* During the Hearing, the Court admitted the dashcam video of the traffic stop into evidence without objection. Dkt. 48 at 1.

**B.     Factual Background**

On September 22, 2022, Investigator Clark received a tip from a confidential informant (the "Informant") about a narcotics purchase set to occur that same day. Dkt. 42 at 1. The Informant was known to Investigator Clark and GCSO. *See* Minute Entry dated April 4, 2024. Investigator Clark testified that he had personally worked with the Informant on five to ten investigations and that the Informant had provided reliable and verifiable information in the past. *Id.* Investigator Clark further testified that the Informant had worked with GCSO for a period of six to eight months prior to September 2022, and the information provided by the Informant had led to approximately ten to twelve successful controlled purchases by GCSO. *Id.*

The Informant told Investigator Clark that Co-Defendant Samuel Cook ("Cook") and a second individual, then-unknown to Investigator Clark, named "Casey" intended to travel that day from Denison, Texas to Dallas, Texas to purchase narcotics. Dkt. 42 at 1. Investigator Clark testified that the Informant advised him that the second individual was a black male and identified the specific area from which Cook and the black male would be leaving. Minute Entry dated April 4, 2024. The informant also told Investigator Clark that Cook would be driving a blue 2007 GMC Yukon (the "Yukon") and the second individual would be driving a white 2019 Nissan Sentra (the

2

"Sentra"). *See* Dkt. 42 at 1. Investigator Clark testified that a mobile tracking device was previously installed on the Yukon, which allowed him to corroborate that the specific area from which Cook left matched the origin location provided by the Informant. Minute Entry dated April 4, 2024.

Investigator Clark testified that he established a surveillance area at the Buc-ee's in Melissa, Texas facing southbound on U.S. Route 75 ("US 75"). *Id.* According to Investigator Clark, Buc-ee's "sits right on the highway," so he could see "all northbound and southbound traffic" from the parking lot. *Id.* Investigator Clark testified that he observed the Sentra, driven by a black male, proceeding south on US 75 while traveling in close proximity to the Yukon. *Id.* Investigator Clark testified that at this time, he was able to obtain the license plate for the Sentra, "so they knew exactly which vehicle they would be targeting later on." *Id.*

After observing the Yukon and the Sentra traveling southbound past the Buc-ee's, Investigator Clark followed the Yukon to a house in Dallas, where Cook parked and went inside. *See* Dkt. 42 at 1–2. After approximately ten minutes, Cook exited the house. *Id.* at 2. Investigator Clark returned north and waited at the Buc-ee's in Melissa for both vehicles to return. *Id.* At approximately 8:00 p.m., Investigator Clark observed the Yukon following the Sentra as the vehicles traveled north on US 75. *Id.* Investigator Clark then informed Deputy Miller that he was following a vehicle of interest, provided him with the information law enforcement had obtained during the investigation, and requested that Deputy Miller, who was in Sherman, Texas, develop probable cause for a traffic stop of the Sentra. *Id.*; *see also* Minute Entry dated April 4, 2024. Investigator Clark testified that he followed the Sentra from Buc-ee's as it traveled north on US 75 to ensure that the Sentra did not exit the highway before reaching Sherman, where Deputy Miller was waiting to intercept the vehicle. Minute Entry dated April 4, 2024. Investigator Clark

testified that as he was following the Sentra, he observed it traveling in the left lane and not passing any other vehicles or obstructions in the right lane before reaching Sherman. *Id.*

Deputy Miller testified that Investigator Clark informed him that the Sentra was traveling north on US 75 and asked him "to find a traffic violation and stop [the Sentra]." *Id.* Deputy Miller testified that he observed Defendant traveling in the left lane without passing a vehicle in the right lane. *Id.* Deputy Miller testified that this action disregards a traffic control device, which is a violation of the Texas Transportation Code. *Id.* Deputy Miller testified that the traffic violation for which Defendant was stopped was based upon "not only what the investigators had seen [Defendant] doing . . . as they were . . . approaching [his] location," but also what he was able to observe himself. *Id.* Deputy Miller testified that the investigators, including Investigator Clark, informed him that as they were following Defendant and approaching Deputy Miller's location, Defendant was driving in the left lane and not passing any vehicles on the right. *Id.* Deputy Miller testified that he then saw Defendant drive "over the hill" in the left lane and there were no cars in the right lane. *Id.* Deputy Miller testified that the investigators had seen Defendant driving in the left lane "for a little while" and that he personally observed Defendant driving in the left lane and not passing any vehicles for five to ten seconds. *Id.*

Deputy Miller then turned on his vehicle's lights to initiate a traffic stop of the Sentra.[1] Dkt. 42 at 2. After the Sentra stopped, Deputy Miller approached and observed that Defendant was the sole occupant. *Id.* After asking Defendant for his driver's license and insurance, Deputy Miller learned that Defendant did not have a license and had no proof of insurance. *Id.* Deputy Miller directed Defendant to exit the Sentra, where Deputy Miller spoke to Defendant near the police

---

[1] Deputy Miller testified that this violation was not captured on the dashcam video, and instead, occurred before the dashcam video started. Minute Entry dated April 4, 2024. Deputy Miller testified that the dashcam video automatically starts when the vehicle's lights are activated and captures the minute preceding the lights being turned on. *Id.* Deputy Miller testified that Defendant's conduct on the dashcam video did not constitute a traffic violation. *Id.*

4

vehicle. *Id.* Defendant explained to Deputy Miller that the Sentra belonged to his friend. Dkt. 48 at 1. Deputy Miller then questioned Defendant regarding his itinerary, to which Defendant responded that he borrowed the Sentra to go to a doctor's appointment and visit a friend in Allen, Texas. *Id.* When asked about his criminal history, Defendant admitted to having served time for assault and possession of marijuana in the 1990s. *Id.*; *see also* Dkt. 42 at 2. Defendant asked for clarification as to why Deputy Miller pulled him over and Deputy Miller responded that he pulled Defendant over for driving in the "left lane not passing, like there was nobody in the right lane next to you." Dkt. 48 at 1. Deputy Miller further explained his basis for the traffic stop, stating "right when you come out of that area, there are signs that say left lane only for passing." *Id.*

Deputy Miller completed the records check nine minutes after initiating the traffic stop and learned that Defendant's license expired in 2002 and Defendant had an outstanding out-of-state misdemeanor warrant for theft. *Id.* Defendant then asked if he's "gotta go to jail," to which Deputy Miller responded "no, I didn't say that, I ain't messing with it." *Id.* Deputy Miller asked for permission to search the vehicle, which Defendant refused. *Id.*; *see also* Dkt. 42 at 3. Deputy Miller next instructed a certified K9, which was in Deputy Miller's vehicle, to sniff around the Sentra. Dkts. 42 at 3; 48 at 1. After the K9 alerted at the back passenger-side door, Deputy Miller and another officer conducted a search of the Sentra. Dkts. 42 at 3; 48 at 1. The search of the Sentra lasted approximately eight minutes, during which Deputy Miller located a glass pipe in a cigarette box and a shoe box with methamphetamine on the rear floorboard. Dkts. 42 at 3; 48 at 1. Defendant was then arrested. Dkt. 42 at 3. The traffic stop lasted a total of twenty-six minutes from the time that Deputy Miller turned on his vehicle's lights to the time Defendant was placed inside Deputy Miller's vehicle. Dkt. 48 at 1.

## II.  LEGAL STANDARD

The Fourth Amendment of the United States Constitution provides a guarantee to individuals "against unreasonable searches and seizures." U.S. CONST. amend. IV. "The reasonableness of traffic stops and investigative detentions of persons suspected of criminal activity is evaluated through a two-step inquiry under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)." *United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013) (citation omitted). First, the Court determines "whether stopping the vehicle was initially justified by reasonable suspicion." *Id.* Second, the Court evaluates "whether the officer's actions were reasonably related in scope to the circumstances that justified the stop." *Id.* "In the context of a traffic stop, once an officer's 'initial suspicions have been verified or dispelled, the detention must end unless there is additional reasonable suspicion supported by articulable facts.'" *United States v. Castro*, 647 F. App'x 388, 391 (5th Cir. 2016) (quoting *United States v. Gonzalez*, 328F.3d 755, 758 (5th Cir. 2003)). Reasonable suspicion is based on the totality of the circumstances. *Id.* (quoting *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006)).

"Although the defendant typically has the burden of proving that the evidence was obtained in violation of his constitutional rights, the burden shifts to the government if the search or seizure occurred without a warrant." *United States v. Marioni-Melendez*, 460 F. App'x 336, 338 (5th Cir. 2012) (citing *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001)). When the burden shifts, the government bears the burden of proving, by a preponderance of the evidence, that it had reasonable suspicion. *See id.* at 338–39; *United States v. Martinez*, 486 F.3d 855, 859 (5th Cir. 2007) ("The crucial fact in this case is that the government bore the burden of proving reasonable suspicion." (citing *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993))). "[A]nd where that suspicion hinges on an informant's tip, part of the government's burden is to address

6

the reliability of that information." *Martinez*, 486 F.3d at 860 (citing *Guerrero-Barajas*, 240 F.3d at 432).

### III. ANALYSIS

In the Motion (Dkt. 41), Defendant argues that "the stop of the vehicle and subsequent search were without warrant and without probable cause, making the evidence thus obtained inadmissible as a matter of law." Dkt. 41 at 1. Defendant first asserts that the initial stop of Defendant was without probable cause because Deputy Miller initiated the traffic stop under the pretext that Defendant was driving in the left lane and not passing another vehicle in violation of the Texas Transportation Code. *See id.* According to Defendant, "he had not been driving in the left-hand lane without passing and was thus not in violation of the traffic laws." *Id.* at 2.

In the alternative, Defendant argues that the search of the Sentra was the result of an illegal detention because, after Deputy Miller completed the check of his driver's license and insurance, Defendant's continued detention became unreasonable. *See id.* at 3. Thus, Defendant asserts that Deputy Miller's continued questioning regarding his travel itinerary and eventual deployment of a police dog to conduct a sniff of the Sentra was unconstitutional. *See id.* at 2–3.

The Government responds that there are two bases that justified the traffic stop at its inception: (1) a traffic violation of driving in the left lane without passing; and (2) the Informant's tip that a black male driving a white 2019 Nissan Sentra would be involved in a drug crime. *See* Dkt. 42 at 5, 7; Minute Entry dated April 4, 2024. The Government further elicited testimony at the Hearing regarding the scope of the traffic stop and asserted that the Informant's tip provided reasonable suspicion to conduct the traffic stop. *See* Minute Entry dated April 4, 2024.

The Court first addresses whether the initial stop was justified by reasonable suspicion. The Court then addresses whether the remainder of the traffic stop was reasonably related in scope to the circumstances justifying the initial stop.

## A.   The Initial Stop

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Andres*, 703 F.3d 828, 832 (5th Cir. 2013) (quoting *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005)) (internal quotation marks omitted). The Court first considers whether there was a traffic violation justifying the initial stop.

### 1.   The Traffic Violation

The Government contends that Defendant drove in the left lane without passing vehicles in the right lane, which constitutes a violation of the Texas Transportation Code. *See* Minute Entry dated April 4, 2024. Although the traffic violation was not captured on the dashcam video admitted into evidence, both Investigator Clark and Deputy Miller testified that Defendant traveled in the left lane without passing a vehicle in the right lane. *See id.* Deputy Miller specifically testified that he observed Defendant driving in the left lane "as he came over the hill" and there were no cars in his proximity that he could have been passing. *See id.*

Deputy Miller testified that he believed Defendant's conduct of driving in the left lane without passing vehicles to be in violation of Texas Transportation Code § 544.004, which provides:

> (a) The operator of a vehicle or streetcar shall comply with an applicable official traffic-control device placed as provided by this subtitle unless the person is:
>
>   (1) otherwise directed by a traffic officer, police officer, or escort flagger; or

8

      (2) operating an authorized emergency vehicle and is subject to exceptions under this subtitle.

  (b) A provision of this subtitle requiring an official traffic-control device may not be enforced against an alleged violator if at the time and place of the alleged violation the device is not in proper position and sufficiently legible to an ordinarily observant person. A provision of this subtitle that does not require an official traffic-control device is effective regardless of whether a device is in place.

TEX. TRANSP. CODE ANN. § 544.004. Deputy Miller testified that the term "traffic control device" includes signs that state "left lane for passing only." Minute Entry dated April 4, 2024. Indeed, Texas Transportation Code § 544.011 provides, "If, on a highway having more than one lane with vehicles traveling in the same direction, the Texas Department of Transportation or a local authority places a sign that directs slower traffic to travel in a lane other than the farthest left lane, the sign must read 'left lane for passing only.'"

    To have reasonable suspicion that a traffic violation occurred under § 544.004, "[o]fficers must . . . point to the facts that allowed them to infer that the defendant had actually passed a sign within a reasonable distance of the stop." *United States v. Buruato*, No. 17-cr-578, 2017 WL 4861999, at *4 (S.D. Tex. Oct. 25, 2017) (citing *Abney v. State*, 394 S.W.3d 542, 548 (Tex. Crim. App. 2013)). Deputy Miller explained to Defendant during the traffic stop that in the area immediately preceding where Deputy Miller was sitting in his vehicle, there were "left lane for passing only" signs. *See* Dkt. 48 at 1. Deputy Miller also knew the route that Defendant was driving because Investigator Clark was following Defendant and informing Deputy Miller of Defendant's location. *See* Minute Entry dated April 4, 2024. Thus, the facts support Deputy Miller's inference that Defendant had actually passed a "left lane for passing only" sign within a reasonable distance of the stop. *Cf. Buruato*, 2017 WL 4861999, at *4 (S.D. Tex. Oct. 25, 2017) (holding that an officer's belief that there was a "left lane for passing only" sign could not justify reasonable

9

suspicion for a traffic stop without "evidence suggesting that [the] [d]efendant had passed a relevant sign"). Accordingly, the Government has met its burden of proving that Deputy Miller had reasonable suspicion to stop Defendant for a traffic violation under §544.004.

### 2. The Informant's Tip

The Government also contends that "the [I]nformant's tip provided ample reasonable suspicion." Dkt. 42 at 5. "An informant's tip may, in certain cases, provide reasonable suspicion." *Martinez*, 486 F.3d at 861. Whether a tip provides reasonable suspicion depends on the following factors:

(1) the credibility and reliability of the informant;

(2) the specificity of the information contained in the tip or . . . report;

(3) the ability of officers in the field to verify the information in the field; and

(4) whether the tip deals with active or recent activity, or has instead gone stale.

*Id.* (first quoting *United States v. Gonzalez*, 190 F.3d 668, 672 (5th Cir.1999); and then citing *United States v. Perkins*, 352 F.3d 198, 199 (5th Cir.2003)); *see also Illinois v. Gates*, 462 U.S. 213, 241–46 (1983).

Here, the Informant had proven to be credible and reliable to law enforcement in the past. In the six to eight months preceding Defendant's arrest, the Informant provided information to GCSO in many investigations, leading to ten to twelve successful controlled purchases. *See* Minute Entry dated April 4, 2024.

Second, the Informant's tip also contained specific information regarding the events set to occur surrounding a drug transaction. The Informant specifically identified one of the suspects by name who was already known to law enforcement, Samuel Cook, and identified Cook's vehicle by make, model, color and year. *See id.*; Dkt. 42 at 1. The Informant also told Investigator Clark

that a black male would be driving a 2019 white Nissan Sentra. *See* Minute Entry dated April 4, 2024. The Informant further identified the location from which the cars were leaving and to where they were going (i.e., a house in Dallas). *See id.*; Dkt. 42 at 1.

Third, Investigator Clark and other officers were able to verify the information provided by the Informant. Investigator Clark verified that the Yukon was leaving Denison by the tracking device previously installed on the Yukon. *See* Minute Entry dated April 4, 2024. When Investigator Clark observed the Yukon traveling south on US 75, he was able to identify a 2019 white Nissan Sentra being driven by a black male traveling in close proximity to the Yukon. *See id.* Investigator Clark also verified that Cook traveled to a house in Dallas, where he went inside for ten minutes and then exited. *See* Dkt. 42 at 2.

Fourth, law enforcement received the information from the Informant on the day that the drug transaction took place; hence, the tip was fresh and not stale. *See id.* at 1. Each of the factors in *Martinez* are met here. *See, e.g., United States v. Steele*, 353 F. App'x 908, 910 (5th Cir. 2009) ("The detail of the information given by the informant, the real time updates given by the informant, and the corroboration of the information by [the officer] were sufficient to establish probable cause that [the defendant's] vehicle contained contraband."); *Powell*, 732 F.3d at 373 ("[The informant] provided [the officer] with the specific basis of his knowledge: he stated that the subjects had just been in his home and were now traveling with the crack cocaine in a specific vehicle to Midland. Here, . . . law enforcement corroborated the informant's information in several material respects—the car's destination, make, model, color, passengers, and a partial license plate. [The officer] received the tip directly from [the informant] and then communicated it to the Midland police officers and detectives who effected the stop and search. [The informant's] tip provided law enforcement with probable cause that [the defendants] were transporting crack

cocaine in the vehicle from the outset."). Thus, the tip alone also provided reasonable suspicion to justify the initial stop of Defendant's vehicle.

### 3. Collective Knowledge Doctrine

It was Investigator Clark who had knowledge of the tip and, thus, reasonable suspicion that Defendant was engaged in a drug crime. But it was Deputy Miller who ultimately stopped Defendant. Thus, Investigator Clark's knowledge must be attributable to Deputy Miller for the tip to be the basis of Deputy Miller's traffic stop of Defendant.

"Under the collective knowledge doctrine, it is not necessary for the arresting officer to know all of the facts amounting to probable cause, as long as there is some degree of communication between the arresting officer and an officer who has knowledge of all the necessary facts." *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007) (citing *United States v. Kye Soo Lee*, 962 F.2d 430, 435 (5th Cir. 1992)). Accordingly, "[r]easonable suspicion to stop a vehicle, or probable cause to conduct a search, may arise through the collective knowledge of the officers involved in the operation." *United States v. Zuniga*, 860 F.3d 276, 282–83 (5th Cir. 2017) (first citing *Powell*, 732 F.3d at 369; and then citing *United States v. Clark*, 559 F.2d 420, 424 (5th Cir. 1977)). The officer "initiating the stop or conducting the search need not have personal knowledge of the evidence that gave rise to the reasonable suspicion or probable cause, so long as he is acting at the request of those who have the necessary information." *Id.* at 283 (citing *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999)).

Here, Deputy Miller was in close communication with Investigator Clark leading up to the traffic stop. *See* Minute Entry dated April 4, 2024. Investigator Clark contacted Deputy Miller to request that he develop probable cause to perform a traffic stop of the Sentra—a "vehicle of interest." *See id.*; Dkt. 42 at 2. Investigator Clark also provided Deputy Miller with the information

12

law enforcement had obtained up to that point in the investigation. *See* Minute Entry dated April 4, 2024. As Defendant was traveling toward Sherman in the Sentra, Investigator Clark informed Deputy Miller of Defendant's location. *See id.* Thus, Investigator Clark's knowledge of the tip and the coinciding investigation can be imputed to Deputy Miller under the collective knowledge doctrine. Taken together with the Court's finding that the Informant's tip provided reasonable suspicion to support a stop, the traffic stop was justified at its inception.

## B.     The Scope of the Traffic Stop

Not only must the initial stop be justified by reasonable suspicion, but the officer's actions throughout the traffic stop must be reasonably related in scope to the circumstances of the stop. *Powell*, 732 F.3d at 369. Defendant argues that the detention became unreasonable once it continued after checking for his license and insurance. Dkt. 41 at 3. At the Hearing, the Government elicited testimony regarding the scope of the traffic stop and asserted that the Informant's tip provided reasonable suspicion to conduct the traffic stop. *See* Minute Entry dated April 4, 2024.

Whether the search was reasonably related in scope is determined by the seizure's mission. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "[A] traffic detention may last as long as is reasonably necessary to effectuate the purpose of the stop, including the resolution of reasonable suspicion . . . ." *United States v. Brigham*, 382 F.3d 500, 512 (5th Cir. 2004). "[T]he relevant question in assessing whether a detention extends beyond a reasonable duration is 'whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.'" *Id.* at 511 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). During a traffic stop, an officer may ask questions regarding the driver's itinerary. *Id.* at 508. Further, "a dog sniff conducted during a

13

lawful traffic stop does not violate the Fourth Amendment's proscription of unreasonable seizures" so long as the stop is not "prolonged beyond the time reasonably required to complete the mission" of the stop. *Rodriguez*, 575 U.S. at 350–51 (cleaned up).

Defendant argues that the detention became unreasonable once Deputy Miller completed his check of Defendant's license and insurance. Dkt. 41 at 3. If a traffic stop is based solely on a traffic violation, an officer's mission, beyond determining whether to issue a traffic ticket for the violation, reasonably includes other "ordinary inquiries incident to [the traffic] stop." *Rodriguez*, 575 U.S. at 355 (alteration in original) (quoting *Caballes*, 543 U.S. at 408) (internal quotation marks omitted). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* (citations omitted).

Here, when prompted for his license and insurance, Defendant did not have a license and did not have proof of insurance for the Sentra. *See* 48 at 1. Further, upon completing a records check, Deputy Miller learned that Defendant's license had expired in 2002 and Defendant had an out-of-state misdemeanor warrant for theft. *See id.* These are all circumstances that create reasonable suspicion sufficient to continue the traffic detention for "as long as is reasonably necessary" to resolve the suspicion. *See United States v. Fishel*, 467 F.3d 855, 856 (5th Cir. 2006) (quoting *Brigham*, 382 F.3d at 512). However, these are not the only circumstances that justified the traffic stop. The traffic stop was also based upon the Informant's tip that Defendant was involved in a drug crime. Thus, the Court will determine whether the scope of Deputy Miller's actions after the records check was complete, i.e., the dog sniff and search of the Sentra, were reasonable based on the totality of the circumstances, including his knowledge of the Informant's

tip.[2] *See Castro*, 647 Fed. App'x at 392 ("[T]he district court noted that the stop was 'not just a traffic stop by itself' but was based on information regarding criminal activity that warranted further investigation. Thus, the purpose of the stop was not achieved once the records check came back clean.").

When a traffic stop is based upon reasonable suspicion of a drug crime, officers have much broader discretion for what is reasonably related in scope. "For instance, they may prolong the stop, ask questions reasonably related to ascertaining whether drug activity is occurring, and wait for a K-9 unit to arrive on the scene." *United States v. Vazquez,* No. 20-cr-212, 2021 WL 5833885, at *14 (S.D. Tex. Dec. 9, 2021) (first citing *Powell*, 732 F.3d at 371; then citing *United States v. Pack*, 612 F.3d 341, 361–62 (5th Cir. 2010)).

Here, Deputy Miller's actions during the stop were related in scope to determining whether a drug crime was afoot. After initiating the stop, Deputy Miller asked Defendant to exit the Sentra and questioned him regarding his travel itinerary. *See* Dkt. 42 at 2. Defendant told Deputy Miller that he was traveling from Denison to Allen for a doctor's appointment and to visit a friend. *See* Dkt. 48 at 1. Deputy Miller also asked Defendant about his criminal history and learned that Defendant had previously been convicted of assault and possession of marijuana. *See id.* Deputy Miller learned through further questioning that Defendant could not provide proof of insurance for the Sentra. *See id.*; Dkt. 42 at 2. Through a records check, Deputy Miller learned that Defendant's license was expired and Defendant had an out-of-state misdemeanor warrant for theft. *See* Dkt. 48 at 1. This questioning and the completion of the records check lasted approximately ten minutes. *See id.* Deputy Miller then asked for permission to search the Sentra, and Defendant denied the

---

[2] The Court further notes that the time between the completion of the records check and the initiation of the dog sniff was less than five minutes because Deputy Miller had the K9 with him when he initiated the stop. *See* Dkt. 42 at 3; *see also Rodriguez*, 575 U.S. at 357 ("The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticker, . . . but whether conducting the sniff 'prolongs'—i.e., adds time to—'the stop[.]'").

15

request. *See id.* Deputy Miller deployed his certified K9, which was in his vehicle at the time of the stop. *See id.* The K9 alerted, leading Deputy Miller and a second officer to search the Sentra where the shoe box with methamphetamine was discovered. *See id.*; *Resendiz v. Miller*, 203 F.3d 902, 903 (5th Cir. 2000) ("A drug-sniffing canine alert is sufficient, standing alone, to support probable cause for a search." (citing *United States v. Williams*, 69 F.3d 27, 28 (5th Cir. 1995))). The shoe box was discovered within twenty-three minutes of initiating the traffic stop. *See* Dkt. 48 at 1; *see also Pack*, 612 F.3d at 362 (finding a thirty-five-minute stop reasonable based on officer's reasonable suspicion of drug activity). The scope of the investigation and the length of the entire detention were reasonable in light of the suspicion that Defendant was involved in a drug crime. Thus, suppression of the evidence resulting from the search of the Sentra is not warranted.

## IV.    RECOMMENDATION

For the foregoing reasons, the Court recommends the Motion (Dkt. 41) be **DENIED**.

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C).

A party filing objections is entitled to a *de novo* review by the district court of the findings and conclusions contained in this report only if specific objections are made, and failure to timely file written objections to any proposed findings, conclusions, and recommendations contained in this report shall bar an aggrieved party from appellate review of those factual findings and legal conclusions accepted by the district court, except on grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140 (1985); *see also Douglass v. United Servs. Auto*

*Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten (10) to fourteen (14) days).

**So ORDERED and SIGNED this 26th day of April, 2024.**

_____
KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE